USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/25/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

DERRY SYKES,

                             Plaintiff,

            -against-

NEW YORK STATE OFFICE OF
CHILDREN AND FAMILY SERVICES;
NEW YORK CITY ADMINISTRATION
FOR CHILDREN SERVICES; STATE OF
NEW JERSEY DEPARTMENT OF
FAMILY SERVICES DIV. OF CHILD
PROTECTION AND PERMANENCY,

                             Defendants.

------------------------------------------------------------ X

1:18-cv-8309-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Plaintiff Derry Sykes is earnestly concerned about the care of J.A., the fifteen-month-old grandson of Mr. Sykes' sister. He is also a convicted felon. Mr. Sykes' application to serve as J.A.'s foster parent was rejected because New York State law and regulations mandate the disqualification of people convicted of certain felonies—including crimes of violence—such as Mr. Sykes' forty year old robbery conviction. In this case, Mr. Sykes brought a number of claims to challenge his disqualification. Because he does not have a liberty or property interest in becoming the foster parent of J.A., who does not reside with Mr. Sykes, Mr. Sykes' claim that he was denied due process lacks merit. For that and the other reasons that follow, each of the defendants' motions to dismiss the complaint against them is GRANTED.

## II. BACKGROUND[1]

### A. Mr. Sykes' Relationship with Grandnephew J.A.

*Pro se* plaintiff Derry Sykes is the great-uncle of J.A., who was fifteen months old at the time that this case was filed.[2] Memorandum in Support of Order to Show Cause, Dkt. No. 6 ("Pl.'s OTSC Mem."), at 2. J.A. is the grandson of Mr. Sykes' sister. Complaint, Dkt. No. 2 ("Compl."), at ¶ 20(iii). The allegations in the complaint make clear that J.A.'s mother is still living, as is his grandmother, Mr. Sykes' sister. Mr. Sykes was 59 years old at the time that this action was filed, and he lives with his long-term domestic partner, Elba Malave. Pl.'s OTSC Mem. at 2.

J.A. is in foster care in New Jersey. His current foster care provider is Ms. Perez, "who has taken excellent care of [J.A.] . . . ." Compl. ¶ 20(i). The precise reasons why J.A. was initially placed in foster care, rather than residing with his mother or another relative, are not stated in the complaint or Mr. Sykes' filings, but Mr. Sykes' complaint describes poor treatment of J.A. during one supervised visit with his mother, which is one of two events that form the basis for Mr. Sykes' complaints against Defendant State of New Jersey Department of Children and Families (the "NJ DCF"), which are described further below. And Mr. Sykes' text exchanges with Ms. Perez suggest that he believes that J.A. should not be placed in his mother's custody, and that visits with her should be terminated. Pl.'s OTSC Mem., Ex. B, at ECF p. 17.

There is no allegation that J.A. has ever lived with Mr. Sykes. The only personal contact between Mr. Sykes and his grandnephew described in the complaint and Mr. Sykes' other filings consists of a single supervised visit that lasted one hour and fifteen minutes. That visit and Mr.

---

[1] Unless otherwise noted, as indicated below, the facts are taken from Mr. Sykes' Complaint, the documents that he submitted in connection with his motion for preliminary injunctive relief or his opposition to the defendants' motions to dismiss and are accepted as true for the purposes of this motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *see also Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").

[2] Mr. Sykes variably refers to J.A. as his "nephew" and his "great-nephew" to describe his relationship with the child over whom he seeks custody. The Court refers to J.A. as Mr. Sykes' grandnephew throughout this opinion.

Sykes' communications with Ms. Perez are described in more detail below. It is apparent, however, that Mr. Sykes is a concerned family member, as reflected by his committed efforts to be approved as J.A.'s foster parent.

B. Mr. Sykes Applies to Become J.A.'s Foster Parent

Mr. Sykes alleges that in March 2018, the NJ DCF asked if he was willing to become J.A.'s foster parent. Pl.'s OTSC Mem. at 2. Mr. Sykes agreed. Because Mr. Sykes lives in New York, his application process was transferred to Defendant New York City Administration for Children's Services (the "NYC ACS"). Mr. Sykes and his partner began the application process, and began to go through training for the program. He received a certificate for one phase of the training on August 1, 2018. Pl.'s OTSC Mem., Ex. B, ECF pp. 22-23. As part of the application process, Mr. Sykes was required to undergo fingerprinting and a criminal record check.

NYC ACS submitted Mr. Sykes' records to defendant New York State Office of Children and Family Services ("OCFS"). OCFS sent NYC ACS a letter dated August 14, 2018, responding to its request for a criminal history check for Mr. Sykes. Pl.'s OTSC Mem., Ex. A, ECF pp. 11-12.

The letter from OCFS to the NYC ACS was captioned "Mandatory Disqualification." It reported that Mr. Sykes had been convicted of "the following Mandatory Disqualifying Conviction(s): Date of Conviction 05/22/1978 Robbery 2d Degree Penal Law 160.10." *Id.* at 11. The same information was reported twice, with the jurisdiction of conviction listed as Kings County Supreme Court.

OCFS's letter reminded NYC ACS that

[W]henever there is a denial or revocation, to provide the applicant or the certified or approved foster or adoptive parent with a copy of this summary of the criminal history and to notify the individual of his or her right to review the records maintained by CDJS or the FBI and of any applicable right(s) the individual may have. For your convenience, in completing the Denial/Revocation Letter/Notice of Results of Fingerprinting/Criminal Record Found, these are **Crimes Involving Violence**.

3

*Id.* at 12. The letter reported two additional convictions for Mr. Sykes, namely a 1994 conviction for "Intent to Obtain Transportation without Paying Penal Law 165.15," and a 1998 conviction for "Criminal Possession of a Controlled Substance 7th Degree Penal Law 220.03." *Id.*

On August 21, 2018, the NYC ACS forwarded the August 14, 2018 OCFS letter to Mr. Sykes under cover of a letter reporting on their foster home study. *Id.* at 10. The NYC ACS stated that the agency was unable to approve Mr. Sykes' home for a foster placement "due to the results of your Criminal Clearances from the NYS Division of Criminal Justice Services . . . and the Federal Bureau of Investigation . . . which were returned with a Mandatory Disqualification due to previous convictions." *Id.* As a result, the agency closed Mr. Sykes' foster home request as of the date of the letter. *Id.*

Shortly after this, in September 2018, Mr. Sykes filed this lawsuit challenging the denial of his foster parent application. He was also aggrieved by the foster parent application process because he was required to fill out an application and to attend a four-hour orientation class before learning the results of the criminal background check that ultimately disqualified him. Compl. ¶¶ 17-18. He argues that it would be "absolutely logically [sic] for Defendant NYC to first administer first [sic] the criminal background investigation before any training which would save tax payers['] money and emotional and mental anguish of be[ing] disqualified . . . ." *Id.* at ¶ 18.

Mr. Sykes later received separate correspondence from OCFS. The agency sent him a "Denial/Revocation Letter" dated November 9, 2018. Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss, Dkt. No. 35 ("Pl.'s Opp."), Ex. A2 (the "OCFS Denial Letter"), at ECF pp. 24-25. The OCFS Denial Letter reiterated the reason why Mr. Sykes had been mandatorily disqualified from serving as a foster parent, namely his felony conviction for a crime involving violence as reported by the FBI. The letter also described the nature of Mr. Sykes' rights in response to the denial. The letter detailed that a hearing was available to challenge the State's

decision "if a foster child is to be removed or is removed from your home because of a criminal history referenced in this letter . . . ." *Id.* at 25. And the letter also stated that a post-denial hearing was available for a "prospective or approved adoptive parent" whose application has been denied or whose approval has been revoked. *Id.* However, because Mr. Sykes, as an applicant to become a foster parent, fit into neither category, the letter informed him that he had a right only to a copy or summary of his criminal history record—not a separate hearing or other process to challenge the denial. *Id.*

Nonetheless, Mr. Sykes requested a review of his denial. On November 16, 2018, Mr. Sykes wrote to OCFS requesting a hearing. Pl.'s Opp., Ex. A1, ECF pp. 21-22. Mr. Sykes noted in his letter that his conviction was over forty years old, and that it was best for his nephew to be in a loving and protected home. He argued that the rejection of his application on the basis of the statutory disqualification was unconstitutional because it judged him unfit without taking into consideration the circumstances of his case. *Id.*

A supervising administrative law judge responded to Mr. Sykes letter on behalf of OCFS on November 30, 2018. Pl.'s Opp., Ex. B, ECF pp. 28-29. The administrative law judge's response to Mr. Sykes was thorough, and merits quotation at length:

> Pursuant to 18 NYCRR Part 443, you would be entitled to a hearing under the current legal and regulatory framework as follows: If there is an indicated report of abuse or maltreatment, you may request a hearing to contest the indicated report. Further, where a foster child is placed in your home, and the social services determined to remove the child from your home, you could request a hearing to contest the removal of the child.
>
> Under the current legal and regulatory framework, you do not have the right to an administrative hearing to review a denial or revocation of your certification as a foster parent based on a mandatory disqualifying crime pursuant to Sections 372-e and 378-a(2)(e)(l) of the Social Services Law (SSL).
>
> Pursuant to SSL § 378-a (2)(e) convictions for certain crimes automatically bar you from being a foster parent, adoptive parent, or child care provider and certain crimes do not. If you have a conviction for some other offense, you are not automatically barred. SSL § 378-a (e)(3) provides that a safety assessment be

provided in accordance with the provisions of Article 23-A of the Corrections Law. SSL § 378-a(2)(h) requires that in such circumstances, a safety assessment be performed.

The case law you are citing, Vlandis v. Kline, 92 S.Ct. 2320 (1973) does not apply to you. Such cases involve adoptive parents.

The foster care system in New York State is wholly a creation of State Law. New York law defines the circumstances under which a child may be placed in foster care, and reserves the authority to decide as it sees fit whether and when a child shall be returned to his natural family or placed elsewhere. Since your case does not involve a foster child who has been removed from your home due to your previous criminal conviction pursuant to SSL § 378-a, the law does not provide you a right to an administrative hearing to contest the determination to deny your application to be a foster parent.

The criminal history check revealed that you have criminal convictions falling within the purview of SSL § 378-a(2)(e)(l), which create an automatic bar or mandatory disqualification from being a foster parent. Therefore, under the current statutory and regulatory scheme, we do not have the jurisdiction to grant your application for a hearing to contest the denial of your application to be certified as a foster parent.

*Id.*

### C. Alleged Incidents of Neglect and Mistreatment.

Mr. Sykes' complaint alleges two incidents of neglect and mistreatment of J.A., which are the basis for his claims that the NJ DCF violated the child's rights under the United States Constitution to be free from cruel and unusual punishment.

The first of two "incidents of child neglect of [J.A.] cause[d] by or under [the] supervision of [NJ DCF]" occurred on or about June 13, 2018. Affidavit in Support of Order to Show Cause, Dkt. No. 5 ("Pl.'s OTSC Aff."), at ¶ 6. Mr. Sykes alleges that on June 13, 2018, he received a text message from Ms. Perez—the excellent foster parent—describing what appears to have been a supervised visit that J.A. made with his biological mother. In her message to Mr. Sykes, Ms. Perez reported that J.A. "visited with his mom at the DCPP Office and was out of the day care center for several hours. He was not fed and diaper not changed during the visit even though all those things were packed. I have communicated this concern to the caseworker. Otherwise he's doing fine."

Compl. ¶ 20(i); *see also* Pl.'s OTSC Mem. at 6.

The second incident of what Mr. Sykes describes as "child neglect/maltreatment" occurred in his presence during a supervised visit to see his grandnephew. Compl. ¶ 20(ii). On August 17, 2018, Mr. Sykes and his partner visited with J.A. in the offices of the NJ DCF. Mr. Sykes and his partner arrived forty-five minutes late to the scheduled visit. Pl.'s OTSC Mem. at 7. During that visit, "the same circumstances reoccurred . . . pertaining to [J.A.] not being fed, given any fluids, nor diaper changed . . . . Also, it should be noted that [J.A.] was crying constantly during the entire duration of the visit." Compl. ¶ 20(ii). Mr. Sykes claims that he was not able to intervene "because the transporter would not allow [him] to hold [J.A.]." Pl.'s OTSC Aff. at ¶ 6. Ms. Perez again reported to Mr. Sykes that J.A. had not been fed, given any fluids or had his diaper changed during J.A.'s visit with Mr. Sykes. Pl.'s OTSC Mem. at 7. At the same time, Ms. Perez informed him that J.A. was doing well that he was "in good spirits" when she picked him up. *Id.*, Ex. B at ECF p. 21.

Mr. Sykes' visit with J.A. lasted about one hour and fifteen minutes. Compl. ¶ 20(ii). During the visit, the assigned case worker stated several times that Mr. Sykes' sister, J.A.'s grandmother, had accused him "of being a pedophile and history of other crimes . . . ." Compl. ¶ 20(iii). Mr. Sykes ignored her allegations "because it was clear to [him] that she was attempting to provoke [him] on hearsay evidence without concrete proof . . . ." *Id.*

According to Mr. Sykes, his visit to J.A. took place in a room "with [no] air conditioning while the temperatures was [sic] well above 90 degrees that day which cause [sic] severe complications to [J.A.'s] respiratory illness . . . ." Pl.'s OTSC Mem. at 7.[3] Mr. Sykes was astonished that the assigned case worker did not offer to move the group to a room with air conditioning until fifteen minutes before the end of the visit. Compl. ¶ 20(iv). He asserts that the move also "reflects

---

[3] While Mr. Sykes states in his OTSC Memo that the room had air conditioning, he separately asserts that it did not, and that lack of air conditioning in the room is the basis for his claim that NJ DCF violated J.A.'s Eighth Amendment right to be free from cruel and unusual punishment. *See* Pl.'s OTSC Aff. at ¶¶ 3-4.

acts of neglect & child abuse . . . ." *Id.* Mr. Sykes also asserts that the assigned case manager was not fully responsive to his requests to schedule additional visits with his grandnephew. Compl. ¶ 20(v).

    D. <u>Statutory Framework</u>

In this case, Mr. Sykes challenges the constitutionality of a provision of the New York State Social Services Law as it applies to him, as a convicted violent felon applying to be a foster parent. Because the challenged provision was implemented in response to a federal statute, however, the Court begins with a brief description of that law.

The federal statute at issue is the Adoption and Safe Families Act of 1997 (the "ASFA"). 42 U.S.C. § 671(a), *et seq.* The ASFA "is Spending Clause legislation directed at state administration of foster care and adoption assistance services." *New York State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 76 (2d Cir. 2019). "To receive federal aid under the Act, states must submit a plan for approval to the Secretary of Health and Human Services (the Secretary). Section 671 [of ASFA] details what a state plan must provide to qualify. Section 671's requirements are numerous and far-ranging; they run from dictating how information about individuals involved in the foster care system may be disclosed, to providing guidelines on how and when a state should give priority to reuniting families." *Id.* (internal citations omitted).

Relevant here is § 671(a)(20)(A)(i) of ASFA, which provides:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—
>
> (20)(A) provides procedures for criminal records checks, including fingerprint-based checks of national crime information databases . . . for any prospective foster or adoptive parent before the foster or adoptive parent may be finally approved for placement of a child . . . including procedures requiring that—
>
> > (i) in any case involving a child on whose behalf such payments are to be so made in which a record check reveals a felony conviction for child abuse or neglect, for spousal abuse, for a

> crime against children (including child pornography), or for a
> crime involving violence, including rape, sexual assault,
> or homicide, but not including other physical assault or battery, if a
> State finds that a court of competent jurisdiction has determined
> that the felony was committed at any time, such final approval
> shall not be granted.

Therefore, in order to receive federal funding for its foster care program, New York State must comply with § 671(a)(20)(A)(i).

New York implemented legislation consistent with AFSA's condition for federal funding. New York State's statute is set forth in New York Social Services Law section 378-a(2)(e)(1)(A). Pursuant to that statute, approval of a prospective foster parents' application "shall be denied" where the criminal history check reveals:

> A felony conviction at any time involving: (i) child abuse or neglect;
> (ii) spousal abuse, (iii) a crime against a child, including child
> pornography, or (iv) a crime involving violence, including rape, sexual
> assault, or homicide, other than a crime involving physical assault or
> battery.

OCFS maintains a list of crimes requiring mandatory disqualification, which designates robbery in the second degree—Mr. Sykes' offense—as a crime involving violence. *See Official List*, N.Y. State Office of Children & Family Servs. (March 2016), https://ocfs.ny.gov/main/policies/external/OCFS_2016/ADMs/CRIMINAL-HISTORY-RECORD-ASFA-REVIEW-STANDARDS.pdf.[4] Under section 378-a(2)(g) of the New York Social Services Law, when NYC ACS rejects an applicant, it must inform them of the reasons for the denial with a summary of the criminal record history and a description of the New York State Division of Criminal Justice Services' process.

### E.  Regulatory Framework

The rules governing the foster parenting process in New York State are complex and need

---

[4] The Court may take notice of matters of public record when deciding a motion to dismiss. *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012).

not be summarized in their entirety in this opinion. Briefly, however, pursuant to the governing regulations, all foster homes must be certified or approved by an "authorized agency."[5] *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 443.3 (2019). "A certificate to board permits an individual to receive remuneration from an authorized agency for the care at board of a child under the age of 18 years . . . ." *Id.* § 443.1(b). "A letter of approval or approval permits a relative within the second or third degree of the parent(s) or stepparent(s) of a foster child to receive remuneration from an authorized agency for the care at board of a child under the age of 18 years . . . ." *Id.* § 443.1(d). A great-uncle, such as Mr. Sykes, is a relative within the second or third degree, and, therefore, while he need not be certified, he must receive a letter of approval in order to serve as a foster parent. *Id.* §§ 443.1(i)(5), 443.3(q)(2). Approval is not guaranteed, and indeed, as described below, is prohibited if a prospective foster parent is a convicted violent felon.

The rules governing the administration of the foster parent application process provide guidance regarding the operating procedures authorized agencies must follow. *See id.* § 443.2. Importantly, those rules describe application procedures, and certain mandatory disqualifying characteristics, but in a studied fashion, they afford authorized agencies broad discretion regarding what applications to accept or reject.

The rules require authorized agencies to respond to inquiries from people who wish to become foster parents—as part of that process they are required to inform potential applicants, among other things, that as part of the application process they will be required to provide fingerprints for the purposes of a criminal history check. *Id.* §§ 443.2(b), (b)(4).

Authorized agencies must also establish procedures to collect a variety of information about

---

[5] The foster care evaluation process may be undertaken either by a local department of social services, or a voluntary authorized agency. *See* N.Y. Soc. Serv. Law § 371(10)(a)-(b) (McKinney 2019); N.Y. Comp. Codes R. & Regs. tit. 18, § 443.1(a) (2019). For the sake of ease, here the Court uses the terms "authorized agency" or "agency," as used in the regulation.

foster parent applicants. That information includes the applicant's employment history, work and child-care references, and character references. *Id.* § 443.2(b)(13). The agency must also collect a sworn statement regarding whether any adult who resides at the proposed foster home has been convicted of a crime, as well as fingerprint cards for all adults living at the proposed foster home in order to run a criminal background check. *Id.*

After an application is completed, the agency is required to "acknowledge, within 10 days of receipt of a completed application, receipt of such form and either reject the applicant for home study or accept the applicant for home study." *Id.* § 443.2(b)(14). As a general matter, the rule does not provide specific guidance to the agency about how it must exercise its discretion to determine whether to accept an applicant for further evaluation through a home study.

If an applicant is accepted for a home study, the agency must then determine whether their household complies with a number of specified criteria. *Id.* § 443.2(c)(1). Those criteria include an evaluation of the health of each member of the prospective foster household, the effect of the applicant's employment on their ability to serve, and the applicant's marital status to the extent that it affects their ability to serve as a foster parent. *Id.* § 443.2(c)(1)(ii)-(iv). An applicant's character is also evaluated. An applicant must provide the reviewing agency with at least three character references, from whom the agency must seek signed statements attesting to "the applicant's moral character, mature judgment, ability to manage financial resources and capacity for developing a meaningful relationship with children" or alternatively "utilize in-person interviews attesting to the same." *Id.* § 443.2(c)(1)(v). In addition, the agency "must explore each applicant's understanding of the role of a foster parent and the applicant's ability, motivation and psychological readiness to be a foster parent . . . ." *Id.* § 443.2(c)(1)(vi).

Again, the regulations provide the reviewing agency broad discretion in whether to approve a prospective foster home. The regulations specify health and safety standards, and physical plant

requirements for any approved foster home. *Id.* § 443.3(a). And the regulations mandate disqualification under certain circumstances. Otherwise, they provide no specific guidelines regarding how the agency should evaluate the information collected from applicants. Instead, the regulations simply require that the agency apprise the applicant of its decision. *Id.* § 443.2(c)(3) ("When an authorized agency decides to discontinue a home study or to deny certification or approval upon completion of the home study, it must advise the applicant in writing of the reasons for the agency's decision and must offer an interview to discuss the decision.").[6]

Agencies have no discretion when it comes to applicants who have been convicted of specified offenses, including Mr. Sykes'. As described above, all applicants must undergo a criminal background check. And pursuant to title 18, section 443.8(e)(1) of the New York Codes, Rules and Regulations, subject to exceptions not applicable here, "the authorized agency *must* deny an application for certification or approval as a certified or approved foster parent . . . when a criminal history record of the prospective or existing foster parent reveals a conviction for . . . a felony conviction *at any time* involving . . . a crime involving violence . . . ." (emphasis added).

In sum, the applicable rules establish procedures for the foster parent application process, and require that authorized agencies collect certain categories of information in the preliminary stage of the application process and during their home study. Agencies have substantial discretion regarding the decision to approve or reject a foster parent based on that information. But they have no discretion with respect to applicants who has been convicted of a violent felony at any time—all such applicants must be rejected.

---

[6] For context, an administrative directive issued by OCFS regarding this decision-making process, similarly provides no specific guidance regarding how an agency must make its determination. Instead, it requires only that an agency complete a "Final Assessment and Determination," the purpose of which "is for the worker to apply their critical thinking skills to assess all the information they have received and to summarize and synthesize where the applicant has strengths and needs." N.Y. State Office of Children & Family Servs., 18-OCFS-ADM-07, *Foster/Adoptive Home Certification or Approval Process* 7-8 (2018), https://ocfs.ny.gov/main/policies/external/ocfs_2018/ADM/18-OCFS-ADM-07.pdf. This directive underscores that the ultimate decision is based upon a critical evaluation of all of an applicant's characteristics. No particular substantive criteria mandate acceptance as a foster parent.

## III. PROCEDURAL HISTORY

On September 12, 2018, Mr. Sykes filed a complaint naming OCFS, the NYC ACS, and the NJ DCF as defendants. Dkt. No. 2. The complaint asserts four causes of action. In the first cause of action, Mr. Sykes claims that the mandatory disqualification provision of section 378-a(2)(e)(1) of the New York Social Services Law violates his constitutionally-protected due process rights. Compl. ¶ 13, 15, 16. He also argues that his crimes of conviction were not crimes of violence proscribed by the state statute. *Id.* at ¶ 14. In the second cause of action, Mr. Sykes claims that his disqualification violates his equal protection rights because the state statute is "a license to violate deserving foster care applicant[s'] civil rights is cruel and with all aspects of tyrant." *Id.* at ¶ 16. Third, Mr. Sykes seeks a declaratory judgment that the NYC ACS' decision to require foster care applicants to undergo potentially-disqualifying criminal record checks after completing the initial steps of a foster parent application represents a waste of time, a scheme to generate money for the agency, and a misuse of taxpayer money. *Id.* at ¶¶ 17-19. The fourth cause of action asserts that the conduct of the NJ DCF in connection with the acts of "neglect" described above violates J.A.'s right to be free from cruel and unusual punishment. *Id.* at ¶¶ 6, 20(i)-(iv). Mr. Sykes seeks punitive damages for himself in the amount of $80,000 and $150,000 to be deposited into a trust for J.A. *Id.* at ¶ 25.

Because Mr. Sykes is proceeding *pro se*, the Court construes Mr. Sykes' complaint to the strongest claims that it suggests. The Court construes Mr. Sykes' complaint to raise claims under 28 U.S.C § 1983 ("§ 1983") against NYC ACS and OCFS for deprivations of his and J.A.'s constitutional rights under the United States Constitution for asserted violations of his due process and equal protection rights as a result of the denial of his foster parent application. The complaint further challenges the constitutionality of section 378-a(2)(e)(1) of the New York Social Services Law.[7] The complaint also raises the question of whether the state statute conflicts with and is

---

[7] The Court does not construe Mr. Sykes to challenge the constitutionality of the funding provisions of AFSA

preempted by 42 U.S.C. § 671(a)(20) and its implementing regulations. *Id.* at ¶¶ 2, 22. The complaint also raises a claim under § 1983 against NJ DCF for violations of J.A.'s rights under the Eighth Amendment. The complaint can be construed to raise a variety of state law claims, including claims that the New York State statute violates the state constitution, and that his denial violated his equal protection rights under that document. It also raises a question regarding whether OCFS properly construes the state statute to capture second degree robbery as a crime involving violence. The complaint could also be read to raise claims against the NJ DCF under New Jersey state law for negligence or other common law torts. To the extent that the complaint can be construed to raise any state law claims, the Court is, as described below, not evaluating those claims in this decision.

On the same day that Mr. Sykes filed his complaint, he also filed a motion for an order to show cause as to why a temporary restraining order and preliminary injunction should not be issued. Dkt. No. 3. In his application, Mr. Sykes sought an order enjoining the defendants from depriving him of post-judgment remedies allegedly guaranteed by the Constitution as well as a declaration that section 378-a(2)(e)(1) was unconstitutional. *See* Dkt. No. 4. The Court held a hearing on the temporary restraining order and preliminary injunction on November 14, 2018. Dkt. No. 10. Because the Court concluded that Mr. Sykes had failed to demonstrate irreparable harm and either a likelihood of success on the merits or a sufficiently serious question going to the merits, it denied Mr. Sykes' application. *See* Dkt. No. 22.

Each of the defendants filed separate motions to dismiss Mr. Sykes' complaint. *See* Dkt. Nos. 25, 27, 58. NYC ACS did not file a substantive motion; instead joining several portions of OCFS' motion. Dkt. No. 27. Mr. Sykes opposed each of the motions. *See* Dkt. Nos. 34-39; 60-62. Defendants replied. Dkt. Nos. 50, 53, 63. For the reasons that follow, these motions are granted in

themselves. As a result, the Court has not certified the matter to the United States Attorney General pursuant to 28 U.S.C. § 2403.

their entirety.

## IV.    LEGAL STANDARD

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept[] all factual allegations [in the complaint] as true and draw[] all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). To avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action, devoid of supporting facts, does not suffice. *Id.* To satisfy the "plausibility" requirement, the plaintiff must plead facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

The standard for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is "substantively identical" to that governing Rule 12(b)(6). *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). However, the plaintiff bears the burden of establishing jurisdiction in a Rule 12(b)(1) motion, and the plaintiff must meet that burden by a preponderance of the evidence. *Aurecchione v. Schoolman Transp. Sys.*, 426 F.3d 635, 638 (2d Cir. 2005). "'[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)).

Because Mr. Sykes is proceeding *pro se*, the Court must liberally construe his allegations and "interpret[ ] [them] to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotation omitted); *see also, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . ." (quotation omitted)); *Nielsen*

*v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where . . . the complaint was filed *pro se*, it must be construed liberally to raise the strongest arguments it suggests." (quotation omitted)). Courts must afford *pro se* plaintiffs "special solicitude" before granting motions to dismiss. *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir 1994). Nevertheless, "dismissal of a *pro se* complaint is . . . appropriate where a plaintiff has clearly failed to meet the minimum pleading requirements." *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

When ruling on a motion to dismiss, "a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013). In deciding these motions, the Court considered a number of documents that were incorporated by reference into the complaint or integral to the claims asserted therein. *See Chambers*, 282 F.3d at 153. For a document to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] documents in framing the complaint.'" *DeLuca v. AccessIT Group, Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Chambers*, 282 F.3d at 153). Here, the Court considered the correspondence with OCFS and the NY ACS which Mr. Sykes either attached to his complaint or his opposition, of which he clearly had actual notice, and upon which he obviously relied. While the Court must accept the facts as alleged in the complaint, "[w]hen allegations contained within the complaint are contradicted by documents attached to the complaint, the documents control, and the Court need not accept the allegations contained within the complaint as true." *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002).

The Court also considered relevant sections of the Federal Register in connection with Mr. Sykes' constitutional due process and preemption claims. *See* 44 U.S.C. § 1507 (permitting courts to take judicial notice of the Federal Register's contents); *Romero v. Bestcare, Inc.*, 15-CV-7397 (JS)

(GRB), 2017 WL 1180518, at *3 n.5 (E.D.N.Y. Mar. 29, 2017) ("Courts are permitted to take judicial notice of the contents of the Federal Register and the Code of Federal Regulations and guidance from administrative agencies." (citing *In re Frito-Lay N. Am., Inc. All Natural Litig.*, No. 12-MD-2413 (RRM) (RLM), 2013 WL 4647512, at *4 (E.D.N.Y. Aug. 29, 2013))).

## V.    DISCUSSION

### A.    Section 1983 Claims Against State Defendants Cannot Proceed

Mr. Sykes' claims against both OCFS and the NJ DCF are barred by sovereign immunity. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." Absent a State's consent, therefore, it is immune from suit in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). Eleventh Amendment immunity extends to defendants who are "arm[s] of the state," including agencies, departments and officials of the state. *Pennhurst*, 465 U.S. at 101-102, 124; *Alabama v. Pugh*, 438 U.S. 781, 781 (1978). OCFS is an agency of the State of New York. *See Kisembo v. NYS Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 519–20 (N.D.N.Y. 2018) (collecting cases). The NJ DCF an arm of the State of New Jersey. *Melendez v. Shack*, No. 12-cv-1925 (JLL), 2013 WL 3873255, at *6 (D.N.J. July 24, 2013) (collecting cases). Because neither New York nor New Jersey have consented to be sued in federal court, the federal claims against each state raised in this case must be dismissed. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39 (2d Cir. 1977) (New York); *Paez v. Lynch*, No. 07-cv-5036 (DMC), 2009 WL 5171858, at *4 (D.N.J. Dec. 23, 2009) (collecting cases) (New Jersey). In any event, Mr. Sykes' claims against them under § 1983 may not proceed because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct.

2304, 2312, 105 L. Ed. 2d 45 (1989).[8]

Mr. Sykes' arguments that the state defendants are not shielded by immunity have no merit. Mr. Sykes argues that the Eleventh Amendment does not bar his claims against the state defendants for three reasons. First, Mr. Sykes asserts that "the Eleventh Amendment does not exclusively immunize State or City agencies for money damages if filed against these local government officials in their individual capacities." Pl.'s Opp. at 16. But here, Mr. Sykes has not asserted claims against any individual state government official. Second, Mr. Sykes appears to argue that the Eleventh Amendment does not bar his claims against the state defendants because he asserts them under the Fourteenth Amendment. *Id.* However, the vehicle for a civil action to enforce a claim that arises under the Fourteenth Amendment is § 1983. *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) ("Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States.").

Finally, Mr. Sykes contends that the Eleventh Amendment does not bar his claims against the state defendants because they appeared before the Court in this action. Pl.'s Opp. at 17. A state waives its Eleventh Amendment sovereign immunity "either if [it] voluntarily invokes [a federal court's] jurisdiction, or else if [it] makes a 'clear declaration' that it intends to submit itself to [a federal court's] jurisdiction." *In re Charter Oak Assocs.*, 361 F.3d 760, 767 (2d Cir. 2004) (quoting

---

[8] The Court does not reach these issues but notes that there are substantial questions regarding Mr. Sykes' standing to pursue his claims involving alleged neglect by NJ DCF on behalf of J.A. Mr. Sykes is not the child's legal guardian, and many courts have found that people in Mr. Sykes' position do not have standing to sue on behalf of family members who are not their minor children. *See, e.g.*, *Ulmer v. Corr. Officer Dibble*, No. 15-CV-0497 (DNH) (TWD), 2016 WL 5940912, at *4 (N.D.N.Y. Oct. 13, 2016); *Cavalea v. Dr. Jane*, No. 10-CV-4602 (JS) (WDW), 2011 WL 795891, at *1 n.1 (E.D.N.Y. Feb. 28, 2011); *Rodriguez v. Jaddie Stewart Agency Inc.*, No. 08-CV-0046 (JFB) (AKT), 2009 WL 212123, at *4 (E.D.N.Y. Jan. 28, 2009); *McCracken v. Natale,* No. 04–CV–5456 (JS) (ARL), 2008 WL 5274317, at *4 (E.D.N.Y. Dec. 17, 2008); *Turner v. Coughlin,* No. 89–CV–772, 1990 WL 179008, at *5 (N.D.N.Y. Nov. 14, 1990). There are also substantial questions whether the alleged mistreatment of J.A. during a supervised visit in the presence of his mother and great-uncle (being in an unairconditioned room, and not having his diaper changed or being fed during an hour and fifteen minute long visit) rise to the level of cruel and unusual punishment prohibited by the United States Constitution. Regardless, the Court need not reach either question here.

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675-76 (1999)). "[A] State 'waives any immunity . . . respecting the adjudication of' a 'claim' that it voluntarily files in federal court." *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002) (*quoting Gardner v. New Jersey*, 329 U.S. 565, 574 (1947)). Here, the state defendants were brought involuntarily into this case as defendants by Mr. Sykes. They have not asserted any claims that might invoke the Court's jurisdiction.

Because the Court lacks jurisdiction over Mr. Sykes' claims against OCFS and the NJ DCF, the Court dismisses them without prejudice. It proceeds to analyze the remainder of Mr. Sykes' federal claims as asserted against the NY ACS alone.

### B. Mr. Sykes Does Not Have a Cognizable Liberty or Property Interest

A party asserting a deprivation of either substantive or procedural due process must first establish a liberty or property interest within the meaning of the Constitution. Mr. Sykes' claim that the disqualification of violent felons from serving as foster parents mandated by section 378-a(2)(e)(1) of the New York Social Services Law violates due process under the United States Constitution fails at this first step—he has no constitutional liberty or property interest in becoming a foster parent. He has no substantive due process right—the interest of a (here relatively distant) biological relative in becoming a foster parent is not a fundamental liberty interest rooted in the Constitution. He has no procedural due process right either: as the OCFS administrative law judge aptly described in his letter to Mr. Sykes, the foster care system is a creature of state law, and it creates no entitlement in him, as J.A.'s great-uncle, to apply for, or to become, J.A.'s foster parent.

#### i. *Substantive Due Process*

"A liberty interest may arise from either of 'two sources—the Due Process Clause itself [or] the laws of the States.'" *Rodriguez v. McLoughlin*, 214 F.3d 328, 337-39 (2d Cir. 2000) (quoting *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). "Among the liberty interests that may

arise under the Due Process Clause itself is 'freedom of personal choice in matters of . . . family life.'" *Id.* (quoting *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 842 (1977) ("*OFFER* ") (quoting *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40 (1974))). "'The liberty interest in family privacy,' whether biological or marital, 'has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in this Nation's history and tradition.'" *Id.* (quoting *OFFER*, 431 U.S. at 845).

Relying on these fundamental rights, in *Rivera v. Marcus*, 696 F.2d 1016 (2d Cir. 1982), the Second Circuit found that custodial foster parents are entitled to due process protections before a child is removed from the foster parent's home. *Id.* at 1025 ("We believe that custodial relatives like Mrs. Rivera are entitled to due process protections when the state decides to remove a dependent relative from the family environment."). Since *Rivera*, it has been clear in this Circuit that kinship foster parents—that is, foster parents who are related to their foster children—are entitled to due process protection before foster children are removed from their custody.[9] Given the Supreme Court's recognition of the role in child-rearing of the "broader family," including "grandparents or other relatives who occupy the same household," *Moore v. City of East Cleveland*, 431 U.S. 494, 505 (1977), the Court has little difficulty in concluding that Mr. Sykes would have a liberty interest that would entitle him to due process if J.A. was living with him and the state wished to remove the child from his custody.

But that is not the question presented here. J.A. is not in Mr. Sykes' custody. This is not a case about a family member's right to maintain a foster family with his biological kin free from state intervention. The state is not seeking to break up an existing kinship foster family unit. The question presented in this case is whether the Constitution directly creates a freestanding

---

[9] Judge McLaughlin provides a useful overview of the standard as applied in this and other circuits in *Rees v. Office of Children & Youth*, 744 F. Supp. 2d 434, 442-56 (W.D. Pa. 2010).

fundamental liberty interest that protects a biological relation's interest in creating a custodial foster relationship where one does not exist, and has not existed before—particularly whether it creates such a fundamental liberty interest in favor of Mr. Sykes, J.A.'s felonious great-uncle.  It does not.

"The first step in substantive due process analysis is to identify the constitutional right at stake. . . .  [Next,] we . . . consider whether the state action . . . was arbitrary in the constitutional sense and therefore violative of substantive due process." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994).  "It is well settled that, where 'the alleged right . . . cannot be considered "so rooted in the traditions and conscience of our people as to be ranked as fundamental,"' notions of substantive due process will not apply." *Local 342, Long Island Pub. Serv. Employees v. Town Bd.*, 31 F.3d 1191, 1196 (2d Cir. 1994) (quoting *Reno v. Flores*, 507 U.S. 292, 303 (1993)).  "Substantive due process protects only those interests that are 'implicit in the concept of ordered liberty.'" *Id.* (*quoting Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  "Indeed, it is axiomatic that the doctrine of judicial self-restraint requires courts 'to exercise the utmost care' when presented with a request to define or develop rights in this area." *Local 342,* 31 F.3d at 1196 (quoting *Collins*, 503 U.S. at 125).

The text of and history of the Due Process Clause do not support Mr. Sykes' position that a great-uncle has a fundamental right to become a foster parent to his grandnephew.  "[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)).  "Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life,

liberty, or property interests of which the government itself may not deprive the individual." *Id.*

Here, Mr. Sykes does not seek protection from government intervention, as in *Rivera*, but suggests that the Due Process Clause of the United States Constitution grants him an affirmative right to become a foster parent. Because "a foster family . . . has its source in state law and contractual arrangements," *OFFER*, 431 U.S. at 845, the Court would be required to find that the Due Process Clause of the Constitution affords Mr. Sykes an entitlement to participate in a state-created program. The Court has found no precedent that concludes that that the Due Process Clause creates an affirmative right for a biological relative to obtain the benefit of a state-created foster parent relationship. [10] The novelty of the question alone supports the exercise of judicial restraint: the Court concludes that it does not. *See Mullins v. Oregon*, 57 F.3d 789, 794 (9th Cir. 1995) ("A negative right to be free of governmental interference in an already existing familial relationship does not translate into an affirmative right to create an entirely new family unit out of whole cloth." (citing *Lipscomb v. Simmons*, 962 F.2d 1374, 1378–79 (9th Cir. 1992))). Because the Due Process Clause of the United States Constitution itself does not give rise to a protected liberty interest, the Court turns to evaluate whether Mr. Sykes has a liberty interest created by New York State law.

ii. *Procedural Due Process*

The state statutes and regulations governing the foster care system do not give Mr. Sykes a right to serve as a foster parent for his biological relative. "A 'unilateral expectation' is not sufficient

---

[10] In *Finch v. City of New York*, 591 F. Supp. 2d 349, 359 (S.D.N.Y. 2008), Judge Scheindlin declined to decide as a matter of law that a non-custodial grandmother did not have a substantive due process interest in taking custody of her biological grandchild. *Finch* did not find that a substantive due process right existed in that context. However, in its analysis, the *Finch* court suggested that such a right could be found based on the application of the factors considered by the Second Circuit in *Rivera* to the specific facts of a given case. The Court respectfully disagrees with that aspect of the analysis in *Finch* for two basic reasons: First, it does not recognize the restraint required in the recognition of new substantive due process rights. Second, it does not grapple with the distinction between a governmental deprivation of rights (as in *Rivera*) and the creation of a new relationship. The factors considered in *Rivera* presumed the existence of a current custodial relationship between the child and the foster parents. *See Rivera*, 696 F.2d at 1025 ("The court suggested that several factors be considered when assessing the liberty interests of a foster parent, including: (1) the biological relationship between the parties; (2) the expectation of the parties *at the time the relationship was commenced*; and (3) the age and previous living experience of the children *prior to entering* the foster care environment." (emphasis added)).

to establish a constitutionally protected . . . right[,] [r]ather, a plaintiff must have 'a legitimate claim of entitlement to' the alleged property interest." *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). As the Second Circuit described in *Rodriguez v. McLaughlin*,

> "[A] State creates a protected liberty interest by placing substantive limitations on official discretion." "The most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decisionmaking . . . and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." To create a liberty interest, a statute or regulation must "contain 'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow."

214 F.3d at 338 (citations omitted).

"Further, the search for specific substantive directives to the decisionmaker is context-specific. It should be obvious that the mandatory language requirement is not an invitation to courts to search regulations for *any* imperative that might be found. The search is for *relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether [the plaintiff] may be deprived of the particular interest in question." *Id.* (quoting *Thompson*, 490 U.S. at 464 n.4) (alterations in original). "[T]he fact that a state has established procedures to be followed does not mean that it has created a protectable liberty interest." *Id.* at 339. "Thus, a statute that merely establishes procedural requirements does not thereby create a liberty interest, because an "'expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause.'"" *Id.* (quoting *BAM Historic District Association v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 n. 12 (1983))).

The statutes and regulations governing New York's foster care program do not create a liberty or property interest that entitles Mr. Sykes to due process. Mr. Sykes has not identified a

particular New York State statute or regulation that creates the interest that he asserts here.  The Court has reviewed the statutes and the regulations governing the certification and approval of foster homes, as described above.[11]  They do not contain explicitly mandatory language that would give rise to a liberty or property interest under these circumstances—there is no set of circumstances, which, if met, would entitle Mr. Sykes to serve as a foster parent.  The only aspect of the regulations which set forth a substantive predicate mandating a particular outcome mandate disqualification.  In particular, as described in depth above, the foster care regime in New York State mandates the disqualification of a felon convicted of a crime of violence.

As an aside, the Court notes that the record does not reveal whether Mr. Sykes' household would otherwise qualify to be considered a suitable foster home for J.A. if he had not been disqualified by his felony.  There may be other facts that would disqualify him from serving.  At this stage, for example, we do not know if Mr. Sykes' home meets the safety and health requirements, and we do not know if he can provide the requisite work or character references who can attest to his moral character and mature judgment.  But what is important is that even if Mr. Sykes was not otherwise disqualified as a result of his criminal conviction or otherwise, New York's foster care program does not contain mandatory language entitling an applicant to serve as a foster parent.  Mr. Sykes does not have an entitlement under the state scheme to become J.A.'s foster parent.  Because he does not have a constitutionally cognizable interest, the state owes him no process to protect him from its deprivation, or to mandate its grant.[12]

---

[11] The Court has also reviewed two additional statutes cited by Mr. Sykes:  Sections 1017 and 1055-b of the New York Family Court Act.  Neither creates a protected liberty interest applicable to Mr. Sykes here.  Section 1017 requires a court that removes a child from their biological parents to notify relatives of the opportunity to become a foster parent or to seek custody of the child.  That statute does not apply here because J.A. is not being removed from his home by a New York court.  Moreover, the statute only entitles a family member to notice of the possibility of becoming a foster parent.  It does not excuse a family member who wishes to become a foster parent from the certification and approval process established by New York's statutes and regulations.  Section 1055-b is similarly inapposite, because it provides guidance to New York courts that are placing children in connection with a child protective proceeding.  It does not establish rules—mandatory or permissive—with respect to an applications to become a foster parent.

[12] In his complaint, Mr. Sykes challenges the NYC ACS' practice of accepting foster care applications and allowing

Mr. Sykes relies heavily on two decisions which held that section 378-a(2)(e)(1) of the New York Social Services Law was unconstitutional as applied in those cases. Both cases are distinguishable from this situation because they involved the prospective *removal* of children from a kinship foster home—the factual scenario in *Rivera*—not the creation of a new kinship foster relationship, as Mr. Sykes requests. *In re Matter of Abel*, 931 N.Y.S.2d 829 (N.Y. Fam. Ct. 2011), involved a woman and her husband who petitioned to adopt her cousin, who had been living with them for seven years. *Id.* at 829-31. The mandatory criminal record check required under section 378-a(2)(e)(1) revealed that the husband had past criminal convictions that required the child to be removed from the couple's custody. The court concluded that removing the child based on the husband's convictions would deprive both parties "of their due process right to an individualized determination of whether th[e] adoption is in [the child's] best interest." *Id.* at 834. It is unclear to what extent the court in *Abel* relied on the United States Constitution, as opposed to the Constitution of New York State, in reaching that conclusion. However, because *Abel* involved a custodial kinship relationship, it does not provide support for Mr. Sykes' position here.

Mr. Sykes next points to *In re Adoption of Corey*, 707 N.Y.S.2d 767 (N.Y. Fam. Ct. 1999). In *Adoption of Corey*, the court concluded that removing foster children from the custody of their foster parents pursuant to the mandatory disqualification provision contained in a prior version of section 378-a(2)(e)(1) violated their "constitutionally protected right, as foster children, to procedural due process which protects them from arbitrary State decisions which significantly impact their custody and welfare . . . and which could indiscriminately force them to lose yet another family relationship."

applicants to participate in training before conducting the potentially-disqualifying criminal background check. *See* Compl. ¶¶ 17-19. Mr. Sykes seeks a declaratory judgment from the Court that this practice constitutes a "waste of time, resources and tax payer[] money" as well as "an exercise in futility." *Id.* at ¶ 17. Because the Court has found that Mr. Sykes has no protected liberty or property interest, the Court does not separately analyze Mr. Sykes' gripe that the application process required some exertions by him before he was informed of his disqualification. The Court is sympathetic to Mr. Sykes' frustration with a process that he perceived to have resulted in an inefficient use of his time, but that does not give rise to a viable federal claim in this case.

*Id.* at 773 (citations omitted).  As reflected in the language quoted above, the *Corey* court's analysis was light on law, and heavy on achieving an outcome apparently valued by the court.  And, like *Abel*, the *Corey* court does not identify which constitution—that of the United States or that of the State of New York—it relied upon.  In any event, the case does not support Mr. Sykes' claim because it too involves the prospective removal of children from an existing custodial relationship, not the creation of one that did not previously exist.[13]

Because Mr. Sykes cannot cure the deficiency identified here through further pleading, his claim challenging section 378-a(2)(e)(1) as unconstitutional under the United States Constitution is dismissed with prejudice.[14]  *See, e.g., Anderson v. City of New York*, No. 16-cv-01051 (GBD) (KHP), 2017 WL 9538862, at *13 (S.D.N.Y. Jan. 19, 2017) (dismissing *pro se* plaintiff's claim alleging deprivation of constitutionally-protected due process rights with prejudice where he failed to identify the existence of a constitutionally-protected liberty or property interest); *Gaines v. City of New York*, No. 14 Civ. 6403 (ER), 2016 WL 951580, at *3 (S.D.N.Y. Mar. 9, 2016) (same); *see also Russell Pipe & Foundry Co. v. City of New York*, No. 94 CIV. 8642 (JFK), 1997 WL 80601, at *10 (S.D.N.Y. Feb. 25,

---

[13]The Court observes that the procedures described in the November 9, 2018 OCFS Denial Letter would provide parents in situations like those confronted in *Abel* and *Corey* with additional process, including a hearing.  Mr. Sykes is not receiving that additional process because his situation is factually distinct from those two cases.

[14] "A threshold question in any case challenging the constitutionality of legislation is whether the attack is directed to the validity of the statute on its face or only as applied to the particular circumstances of the litigant bringing the challenge." *United States v. Arzberger*, 592 F. Supp. 2d 590, 598 (S.D.N.Y. 2008).  Mr. Sykes does not categorize his attack on section 378-a(2)(e)(1)'s constitutionality as either a facial or as an as-applied challenge; however—construed liberally—his complaint can be read to argue that the statute is unconstitutional on its face as well as based on the specific facts of his case.  In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court observed that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745.  *Salerno* remains the basis for evaluating facial constitutional challenges in the Second Circuit.  *See Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008); *National Abortion Fed'n v. Gonzales*, 437 F.3d 278, 293-94 (2d Cir. 2006), *vacated on other grounds*, 224 Fed. Appx. 88 (2d Cir. 2007); *Bach v. Pataki*, 408 F.3d 75, 89 (2d Cir. 2005).  In contrast, an as-applied challenge to a statute's constitutionality requires "an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right."  *Genco Importing Inc. v. City of New York*, 552 F. Supp. 2d 371, 381 (S.D.N.Y. 2008) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174-75 (2d. Cir. 2006)).  The Court concludes that Mr. Sykes' as-applied challenge, which is subject to a less exacting standard, fails; any facial challenge to the statute's constitutionality also fails.  *See Bach*, 408 F.3d at 94 (finding failure to prevail on as-applied challenge fatal to facial challenge as well), *overruled on other grounds*, *Schoenefeld v. Schneiderman*, 821 F.3d 273, 279 (2d Cir. 2016).

1997) (dismissing plaintiff's claims alleging deprivation of due process rights under the constitutions of the United States and New York State where plaintiff failed to identify a constitutionally-protected property or liberty interest).

### C. Mr. Sykes' Preemption Argument Fails

Mr. Sykes' argument that section 378-a(2)(e)(1) of the New York Social Services Law is invalid because it "contradicts . . . and conflicts with" 42 U.S.C. § 671(a)(20) is unsound because the state statute is wholly consistent with the federal spending legislation that inspired it.  Compl. ¶¶ 2, 22.  The doctrine of federal preemption is rooted in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  A state law is preempted under the Supremacy Clause in three circumstances:  (1) where Congress expressly provides for preemption on a particular subject (express preemption), *see English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990); (2) where Congress so thoroughly regulates conduct in a field that Congress implies that it intends the federal government to occupy the field exclusively (field preemption), *id.* at 79; and (3) where state law "actually conflicts with federal law" (conflict preemption).  *Id.*; *see also Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 138 (2d Cir. 2010).  Because Mr. Sykes argues that section 378-a(2)(e)(1) "contradicts" and "conflicts with" 42 U.S.C. § 671(a)(20), the Court construes his complaint to assert a conflict preemption argument.[15]  Conflict preemption occurs "when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress."  *United States v. Locke*, 529 U.S. 89, 109 (2000) (quotations omitted).

---

[15] While in his complaint, Mr. Sykes only alleges that section 378-a(2)(e)(1) conflicts with 42 U.S.C. § 671(a)(20), in his opposition, he argues that section 378-a(2)(e)(1) is at odds with 45 C.F.R. § 1356.30.  The Court, therefore, understands Mr. Sykes to argue that section 378-a(2)(e)(1) is invalid because it conflicts with 45 C.F.R. § 1356.30 as well.

The state legislation does not conflict with the federal legislation. At the outset, as the Second Circuit reaffirmed earlier this year in *New York State Citizens' Coal. for Children*, the federal statute is spending legislation. 922 F.3d at 76. For context, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The content of section 378-a(2)(e)(1) of the New York Social Services Law is substantially identical to the federal statute and its implementing regulation, 45 C.F.R. § 1356.30. That is to be expected, given that the State program must comply with the federal requirements in order for the State to be eligible to receive federal funding. Far from standing as an obstacle to the goals of Congress established in the federal statute, the state statute implements and effectuates its goals. The State of New York has established a law that permits it to qualify for the federal funding provided for by AFSA.

Mr. Sykes grounds his argument in a comment and response that the Administration on Children, Youth and Families received in January 2000 during the comment period it held before promulgating a final rule amending the requirements governing the agency's review of a state's conformity with its adoption and foster care plans under Title IV. *See* Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed. Reg. 4020, 4067-68 (Jan. 25, 2000) (to be codified at 45 C.F.R. pt. 1356). Mr. Sykes' hones in on the following comment and response from the agency:

> Comment: One commenter recommended that the phrase in [45 C.F.R.] § 1356.30(b)(4), "violent crime, including rape, sexual assault * * *," be revised to reflect the ASFA language of "crime involving violence." The commenter was concerned that certain nonviolent crimes, such as robbery, may involve violent actions that should be considered when determining the suitability of prospective foster and adoptive parents.

> Response: We concur with this comment and have revised the
> regulation to reflect the statutory language.

*Id.* (the "Comment and Response"). Mr. Sykes argues that, by accepting this comment, the agency

modified 45 C.F.R. § 1356.30 to distinguish between "violent crimes" and "crimes involving

violence" and, furthermore, to exclude robbery from the "crime[s] involving violence" that require

automatic disqualification of a foster parent's application. *See* Pl.'s Opp. at 11, 13. Because the

OCFS' list of offenses requiring mandatory disqualification under section 378-a(2)(e)(1) includes

robbery, Mr. Sykes argues that section 378-a(2)(e)(1) is unlawful because it conflicts with federal law.

Mr. Sykes' argument lacks merit because the Court looks to the final text of the statute and

the rule in the first instance to understand their import. Moreover, a plain reading of the comment

and the agency's response undermines Mr. Sykes' argument. The commenter was concerned that

the agency's prior proposed language might be read *not* to capture crimes like robbery. And the

agency agreed—adopting language that would capture a broader category of crimes of violence,

including Mr. Sykes' robbery conviction.

The language of section 378-a(2)(e)(1), 42 U.S.C. § 671(a)(20), and 45 C.F.R. § 1356.30 are

almost identical and require the same outcome: that a conviction for a crime involving violence

disqualifies a foster care applicant.[16] No conflict exists between the federal and state law, or

between the federal regulation and state law. Section 378-a(2)(e)(1) does not frustrate Congress'

objective in passing 42 U.S.C. § 671(a)(20). Instead, it furthers it, by permitting New York State to

qualify for federal funding. Mr. Sykes' preemption argument fails. Because Mr. Sykes cannot cure

---

[16] The Court is not evaluating here whether the State has properly characterized Mr. Sykes' crime of conviction for second degree robbery as "a crime involving violence, including rape, sexual assault, or homicide, *other than* a crime involving physical assault or battery." N.Y. Soc. Serv. Law § 378-a(2)(e)(1)(A) (McKinney 2019) (emphasis added). The Court need not evaluate that question because to the extent that the state's construction of that requirement is overinclusive—that is, to the extent the state has interpreted its statute to extend to categories of felonies not mandated by the federal statute—it still does not conflict with the federal statute, which establishes minimum standards for qualification for federal funding. The federal law does not require that states design their programs to permit felons convicted of robbery to become foster parents.

the deficiency identified here through further pleading, his claim that section 378-a(2)(e)(1) of the New York Social Services Law is preempted by federal law is dismissed with prejudice.

### D. Equal Protection Claim

Mr. Sykes' complaint also does not state a claim for the denial of his rights under the Equal Protection Clause of the Constitution of the United States. The Supreme Court has explained that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To state a claim for an equal protection violation, [a plaintiff] must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). Mr. Sykes' differential treatment resulted from his conviction for a violent felony. He does not claim discrimination on the basis of his membership in any constitutionally protected class.

To the extent Mr. Sykes contends that he has a "class-of-one" equal protection claim, that claim also fails. A class-of-one claim exists "where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The Second Circuit has held that to succeed on such a claim, a plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *abrogated on other grounds*, *Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008). The first requirement is exacting; class-of-one plaintiffs must "prove 'intentional disparate treatment,' that is, demonstrate the decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Analytical Diagnostic Labs, Inc. v.*

*Kusel*, 626 F.3d 135, 143 (2d Cir. 2010) (quoting *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001)). Here, of course, Mr. Sykes is not a class of one—he is part of a class of convicted felons identified by New York State's statute and regulations. There is no allegation that others convicted of similar crimes are treated differently than Mr. Sykes—to the contrary, the regulations apply uniformly to all similarly situated felons. As a result, to the extent that the complaint can be read to raise an equal protection claim, it fails. Because any claim that denial of his application on the basis of his felony conviction violated his rights under the Equal Protection Clause would be futile, the Court denies leave to amend with respect to this claim.

      E.  <u>State Law Claims</u>

      Having dismissed all of Mr. Sykes' claims arising under federal law pursuant to 28 U.S.C. § 1331, the Court must examine whether there is any other basis for jurisdiction. The Court concludes that it cannot exercise diversity jurisdiction over this action. Mr. Sykes pleads that he is a resident of New York, and two of the defendants—the State of New York and the City of New York—are about as New York as they come. Where, as here, complete diversity of citizenship does not exist, the Court cannot exercise diversity jurisdiction. *See, e.g.*, *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) ("Since *Strawbridge v. Curtiss*, 3 Cranch 267 (1806), this Court has read the statutory formulation 'between . . . citizens of different States,' 28 U.S.C. § 1332(a)(1), to require complete diversity between all plaintiffs and all defendants.").

      When a district court has original jurisdiction over claims in a case, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III." *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (quoting 28 U.S.C. § 1367(a)); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) ("Pendent jurisdiction . . . exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their

Authority,' and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" (quoting U.S. Const. art. III, § 2)). Claims are considered "'part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)). For purposes of this decision, the Court assumes, without deciding, that the remaining state law claims form part of the same case or controversy as the federal claims that have been dismissed by the Court.

The decision to exercise supplemental jurisdiction over a state law claim is by nature discretionary. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). Where claims satisfy the "same case or controversy" test under 28 U.S.C. § 1367(a), however, "the discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of subsection 1367(c)." *Shahriar*, 659 F.3d at 245 (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998)). Subsection 1367(c) permits a court to decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Here, subsection (3) applies because the Court has dismissed all of the claims over which it had original jurisdiction. Therefore, the Court may exercise its discretion to decline supplemental jurisdiction over the remaining state law claims.

Even "where at least one of the subsection 1367(c) factors is applicable, a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated in *Gibbs*, 383 U.S. at 726: economy, convenience, fairness,

and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). Both the Second

Circuit and the Supreme Court have "held that when the federal claims are dismissed the 'state

claims should be dismissed as well.'" *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d

Cir. 1998) (quoting *Gibbs*, 383 U.S. at 726). "Although this is not a mandatory rule, the Supreme

Court has stated that 'in the usual case in which all federal-law claims are eliminated before trial, the

balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

convenience, fairness and comity—will point toward declining jurisdiction over the remaining state-

law claims.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). This is the

usual case: the Court has evaluated the values articulated in *Gibbs* in the context of this case and has

concluded that they support the Court's decision to decline supplemental jurisdiction.

This conclusion is particularly compelling here, given that the case is in a very early stage.

The parties have conducted no discovery, because the Court stayed discovery pending resolution of

the defendants' motions to dismiss. *See* Dkt. No. 22. This Court is, therefore, no more familiar with

the facts and legal issues of this case than any court would be at the pleading stage. Resolution of

the state-law claims in state court will avoid "needless decisions of state law" by this Court, which

promotes the interests of comity and justice. *Moran v. Tryax Realty Mgmt., Inc.*, No. 15-cv-08570

(RJS), 2016 WL 3023326, at *4 (S.D.N.Y. May 23, 2016) (quoting *Gibbs*, 383 U.S. at 726). Because

Mr. Sykes raises claims regarding whether New York State statutes are consistent with the New

York State constitution, it is particularly appropriate for this Court to defer the questions to the

judiciary of the State. As noted above, the two cases cited by Mr. Sykes that have found the New

York State statute to have been unconstitutional did not identify whether they were analyzing the

question under the United States Constitution or that of the State. Finally, declining to exercise

supplemental jurisdiction will not be unfair. The state court systems where Mr. Sykes will be able to

pursue his state law claims are extremely capable.

Although the exercise of supplemental jurisdiction is discretionary, an analysis of the relevant factors in the usual case "will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch*, 154 F.3d at 61 (quoting *Cohill*, 484 U.S. at 350 n.7). So too here. Having considered the factors articulated in *Gibbs*, the Court declines to exercise supplemental jurisdiction over Mr. Sykes' remaining state-law claims.

## VI.   CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED. All of Mr. Sykes' federal claims against Defendants are dismissed with prejudice. Because the Court has declined supplemental jurisdiction over Mr. Sykes' state law claims, those claims are dismissed without prejudice.

The Court requests that counsel for Defendants provide Mr. Sykes with copies of any unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 25, 27, and 58, enter judgment for Defendants, and close this case. The Clerk of Court is further directed to mail this opinion and order, by certified mail, to Mr. Sykes at the address listed on the docket.

SO ORDERED.

Dated: September 25, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge